```
            IN THE UNITED STATES DISTRICT COURT FOR
          THE DISTRICT OF MARYLAND, NORTHERN DIVISION

                                  *
BROADWING CORPORATION F/K/A
CORVIS CORPORATION                *

     Plaintiff,                   *

v.                                *
                                           CIVIL NO.: WDQ-04-3163
GREAT NORTHERN INSURANCE          *
COMPANY,
                                  *
     Defendants.
                                  *

 *    *    *    *    *    *    *    *    *    *    *    *    *
```

Memorandum Opinion

Broadwing Corporation ("Broadwing"), formerly known as Corvis Corporation, has sued Great Northern Insurance Company ("Great Northern") for breach of contract. Pending are Great Northern's motions for partial summary judgment and to exclude the expert testimony of Stephen Allen and Dr. William Emkey. Also pending are Broadwing's and Great Northern's motions to seal. For the following reasons Great Northern's motions *in limine* and for summary judgment of Count I will be denied. Broadwing's and Great Northern's motions to seal will be granted.

I. Background

Broadwing is a Maryland based producer of telecommunications equipment. Complaint, p. 1-2. On March 14, 2003, a fire at Broadwing's Columbia, Maryland storage facility damaged

1

Broadwing's inventory of finished and partially finished telecommunications equipment. Complaint, ¶ 18-21. Broadwing sought indemnification from its insurer, Great Northern, claiming $46 million in damages. Great Northern disputed the damages and has paid only $4.5 million.

Broadwing has sued Great Northern for breach of contract, arguing that Great Northern has failed to adequately indemnify it for the damage to its "raw stock", "stock in progress" and "finished stock."[1] Great Northern has moved for summary judgment of Count I and to exclude the testimony of Stephen Allen and Dr. William Emkey.

II.  Motion to Exclude the Testimony of Dr. William Emkey

Broadwing has disclosed that it will offer the expert testimony of Dr. William Emkey at trial. Dr. Emkey will testify that: 1) there is a possibility that smoke and soot particles released in the March 2003 fire contaminated Broadwing's non-hermetically sealed optical equipment; 2) such contamination could compromise the equipment's reliability; 3) it would be difficult to test the equipment for contamination; and 4) contaminated equipment cannot be cleaned without being destroyed. Emkey Dep., p. 22-24.

---

[1] Count I alleges breach of contract with respect to Broadwing's "raw stock" and "stock in progress"; Count II alleges breach of contract with respect to the "finished stock."

Great Northern has moved to exclude Dr. Emkey's testimony arguing that: 1) he lacks the training or expertise to offer an expert opinion; 2) his theories are unreliable; and 3) his opinion would not assist the jury.

Under Federal Rule of Evidence 702, trial judges act as gatekeepers to ensure that expert witnesses are qualified and their testimony reliable.[2]  Federal Rule of Evidence 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194 (4th Cir. 2001); *Shreve v. Sears, Roebuck & Co., Inc.*, 166 F.Supp.2d 378 (D.Md. 2001).  In order to do so, a trial court must conduct a preliminary assessment of whether the expert is qualified and if the reasoning or methodology underlying the testimony is scientifically valid and can be applied to the facts in issue.  *Cooper,* 259 F.3d at 199.  The party offering the expert testimony must establish its admissibility by a preponderance of evidence.  *Id.*

---

[2] Federal Rule of Evidence 702 provides that a qualified expert witness can offer his opinion if:
> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Federal Rule of Evidence 702.

3

A.   Whether Dr. Emkey is Qualified

In order to be admissible, an expert's opinion must be based on "some special skill, knowledge or experience concerning the particular issue before the court." *Shreve*, 166 F.Supp.2d at 392 (quoting *Ancho v. Penteck Corp.,* 157 F.3d 512 (7th Cir. 1998). Importantly, "the fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify in all related areas." *Id.*

Dr. Emkey is a trained physicist and has extensive knowledge of the design and performance of optical telecommunications equipment.  He received a Ph.D in physics from Lehigh University in 1970 and was an associate professor of physics at the Pennsylvania State University until 1980.  Emkey Report Ex. A. Between 1980 and 1999, while at Bell Laboratories and Lucent Technologies, Dr. Emkey researched and developed technologies associated with fiber-optic communications systems and oversaw several programs involving equipment quality control and reliability.  *Id.*  Between 1999 and 2003, Dr. Emkey worked for two small fiber-optic equipment companies, serving as Vice President of Technical Marketing at Lightchip Corporation between 1999 and 2001, and Vice President and Chief Technology Officer of KSARIA Corporation between 2001 and 2003.  *Id.*  In addition, Dr. Emkey is the author of numerous papers on electro-optic devices associated with fiber-optic communications equipment and holds

4

eight patents on optical devices.  *Id.*  Dr. Emkey has also testified that he has extensive experience with the type of equipment stored in Broadwing's warehouse.  Emkey Deposition, p. 29.

Although Great Northern argues that Dr. Emkey lacks training in fire analysis, he has extensive experience and expertise with fiber-optic telecommunication equipment similar to the equipment allegedly damaged in the March 2003 fire.  Accordingly, the Court finds Dr. Emkey qualified to opine as to the likelihood of particulate contamination based on the conditions in the warehouse and the design and operation of the Broadwing equipment, the difficulty of testing the equipment for contamination, and the impossibility of cleaning contaminated equipment.

B.  Whether Dr. Emkey's Testimony Will Be Reliable

As noted above, under Rule 702, the Court must ensure that expert testimony is reliable.  *Daubert,* 509 U.S. at 589.  In determining the reliability of an expert opinion the court may consider:

> 1) whether a theory or technique can be or has been tested; 2) whether it has been subjected to peer review and publication; 3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and 4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

5

*Id* at 592-593; *Cooper,* 259 F.3d at 199; *Shreve*, 166 F.Supp.2d at 394.

Great Northern argues that Dr. Emkey's testimony is unreliable because his theory that there may have been particulate contamination of Broadwing's equipment and that this contamination would compromise the equipment's reliability: 1) has not been tested; 2) has not been subject to peer review; 3) is not generally accepted; and 4) is based on unreliable data. Broadwing argues that in forming his opinion, Dr. Emkey relied on generally accepted scientific laws and theories and the type of data on which experts reasonably rely.

Dr. Emkey's theory begins with the basic premise that contamination in an optical system like that stored in Broadwing's warehouse can degrade the system's performance due to, *inter alia,* the contaminant's physical interference with the optical beam. Emkey Report, p. 2-8. Dr. Emkey bases this contention on his own work with electro-optical devices and research papers referenced in his report.

Dr. Emkey then argues that given the high concentration and small size of the soot particles released by the fire and the fact that the Broadwing optical equipment was not hermetically sealed (it was not airtight), the Second Law of Thermodynamics predicts that soot particles could diffuse into the non-hermetically sealed portions of the equipment and, over time,

6

affect the equipment's performance.  *Id* at p. 11-12.  Dr. Emkey bases his opinion on reports of the fire prepared by MVA Scientific Consultants and Hughes Associates Incorporated and the design and construction of Broadwing's equipment as reported in the Broadwing Engineering Report.

Dr. Emkey concedes that: 1) he has not tested or examined the equipment supposedly damaged in the fire; 2) he has not calculated the probability that any particular piece of equipment was damaged; and 3) he has not taken into account the fact that the optical equipment allegedly damaged in the fire was stored in plastic bags or boxes and that the laser welds of the equipment (through which Dr. Emkey hypothesizes that the particles could have diffused) were covered by rubber "strain relief boots." Emkey Dep., p. 30-32, 141-142, 174, 177-178.[3]  In addition, Great Northern asserts, there is no general scientific acceptance for some of Dr. Emkey's theories as to how soot particles could degrade the reliability of the equipment.

Importantly, however, Dr. Emkey will opine only that it is possible that Broadwing's equipment was contaminated by the warehouse fire.  As his theory is based on generally accepted scientific principles (the Second Law of Thermodynamics) and reports provided by Broadwing engineers and fire damage experts

---

[3] At his deposition, Dr. Emkey conceded that the packaging and "strain relief boot" would effect the probability of particulate contamination.  *Id.*

7

(reasonable sources to rely upon) his opinion is sufficiently reliable to be admitted.

C.  Whether Dr. Emkey's Opinion Would Assist the Jury

Great Northern further argues that Dr. Emkey's testimony would be unhelpful and confuse the jury because his theory did not take into account the fact that the equipment was packaged and fails to quantify the probability that the equipment was contaminated.

As noted above, however, Dr. Emkey has testified that packaging around the optical equipment would affect, but not eliminate the possibility of contamination.  Furthermore, his inability to quantify the probability of contamination goes to the weight of the evidence rather than its admissibility.  Accordingly, the Court finds that Dr. Emkey's testimony is admissible insofar as it may assist the jury.

D.  Conclusion

For the reasons stated above, Great Northern's motion to exclude the testimony of Dr. Emkey will be denied.

III.  Motion to Exclude the Testimony of Stephen Allen

Broadwing has disclosed that it will also offer Stephen Allen as an expert witness.  Mr. Allen will testify that: 1)

Broadwing's products at the time of the March 2003 fire were state-of-the-art; 2) Broadwing's equipment was well suited for the Department of Defense's ("DOD") Global Information Grid Bandwidth Expansion ("GIG-BE") program; 3) equipment vendors generally price their products above the manufacturing costs; and 4) no telecommunications carrier would purchase fire-contaminated optical equipment.

Great Northern has moved to exclude Mr. Allen's testimony on the grounds that: 1) he lacks the requisite training and experience to testify; 2) his opinions are unreliable; and 3) his opinion as to the GIG-BE contract is based on classified information.

A.  Whether Mr. Allen is Competent

As noted above, an expert's opinion must be based on "some special skill, knowledge or experience" in order to be admissible.  *Shreve*, 166 F.Supp.2d at 392 (quoting *Ancho v. Penteck Corp.,* 157 F.3d 512 (7th Cir. 1998).  Great Northern argues that Mr. Allen lacks the training or experience to offer an expert opinion about Broadwing's equipment, the GIG-BE contract or the pricing and purchasing of telecommunications equipment.

Mr. Allen, however, is a consultant with extensive experience in the telecommunications industry.  Between 1995 and

9

2001, Mr. Allen served as AT&T's Engineering Director for Intercity Fiber Networks.  Allen Dep. p. 21; Allen CV, p. 1. During that time he was involved in a project to build a 16,000 mile fiber-optic network and was responsible for negotiating equipment supplier contracts; a responsibility that required an intimate knowledge of the different types of telecommunications equipment that would be used.  *Id.*  Between 2002 and 2003, Allen served as AT&T's Vice President for Capital Planning and Management where he was responsible for allocating the company's $3 billion capital budget to specific projects.  Allen Report, p. 5; Allen CV, p. 1.

Mr. Allen also has extensive experience with the DOD's GIG-BE program.  In 2003, Mr. Allen served as the senior member of the AT&T team that prepared the company's proposal for the GIG-BE program's fiber-optic infrastructure component and, therefore, is familiar with the nature of the program and the equipment best suited to its needs.  Allen Report, p. 3.

Given this experience, the Court finds that Mr. Allen is qualified to opine as to the technical sophistication of Broadwing's equipment at the time of the fire, the general pricing policies of equipment vendors, whether telecommunications carriers (like AT&T) would purchase potentially fire-damaged equipment and whether Broadwing's products were well-suited for the GIG-BE program.

10

B.   Whether Mr. Allen's Opinion is Reliable

Great Northern also contends that Mr. Allen's opinions are unreliable and should be excluded insofar as they rely on inadmissible hearsay or unsubstantiated facts. Specifically, Great Northern argues that Mr. Allen's opinion that Broadwing's equipment was state of the art and that it was well suited for the GIG-BE program was based on information provided by Broadwing.

Mr. Allen has testified, however, that he formed his opinions after reviewing not only the reports prepared by Broadwing, but also his general knowledge of the industry, industry reports, Broadwing's 10-K filings, financial analyses, press releases and information on the GIG-BE website. Allen Dep., p. 62-72. Accordingly, the Court finds his opinions as to Broadwing's products to be sufficiently reliable to be admitted.

Great Northern further argues that there is no basis for Mr. Allen's opinion that equipment vendors generally price their products above the manufacturing cost or that telecommunications carriers would refuse to purchase potentially fire damaged equipment. However, given Mr. Allen's education (an M.B.A from the University of Pennsylvania) and experience (AT&T's Engineering Director for Intercity Fiber Networks and Vice President for Capital Planning), the Court finds a sufficient basis for his opinions as to telecommunication equipment pricing

11

and purchasing.  Although Great Northern points out exceptions to Mr. Allen's opinions, these exceptions speak more to the weight that should accorded to his testimony than its inherent reliability.  Accordingly, the Court finds Mr. Allen's opinions sufficiently reliable to be admitted.

C.  Whether Mr. Allen's Opinion is Based on Classified Information

Great Northern further argues that Mr. Allen's opinion as to the suitability of Broadwing's equipment for the GIG-BE contract is based on classified information and, therefore, should be excluded under Rule 26(a)(2)(B).[4]

According to Mr. Allen, the GIG-BE program sought to create a sophisticated fiber-optic communications network linking critical DOD sites around the world.  Allen Report, p. 3.  Mr. Allen testified that as the program sought to connect "far-flung bases", the program envisioned a long network requiring ultra long-haul telecommunications equipment.  Allen Dep., p. 122-125; Allen Rep., p. 3.  Given his knowledge that Corvis was a market leader in the production of such equipment (an opinion based on Mr. Allen's general knowledge of the industry) and the fact that

---

[4] Rule 26(a)(2)(B) requires that a party disclose "the data or other information considered by the [expert] witness in forming [his] opinions."  Federal Rule of Civil Procedure 26(a)(2)(B).

12

Corvis had been invited to participate in the testing phase of the project, Mr. Allen opined that Corvis's equipment was well suited to the GIG-BE program.

Great Northern argues that Mr. Allen's conclusion that the program would require ultra long-haul telecommunications equipment was based on classified information about the network's topography.  However, the fact that the program would require ultra long-haul equipment was not classified information; industry reports indicated what equipment the program would require.  Lehman Brothers Equity Research, July 3, 2003, attached as part of the Allen Report.  The only information that Mr. Allen could not disclose was the specific locations that would be linked in the network and the order in which they would be linked.  Allen Dep. p. 121.  Therefore, the Court finds that Mr. Allen's opinion is based on publicly available information.  Accordingly, his opinion that the Corvis equipment was suitable for the GIG-BE contract can be admitted.

D.  Conclusion

For the reasons stated above, Great Northern's motion to exclude the testimony of Stephen Allen will be denied.

IV.  Motion for Partial Summary Judgment

Great Northern has moved for summary judgment of Count I

arguing that only raw stock, not stock in process was stored in Broadwing's warehouse and that Broadwing cannot show that the raw stock was damaged in the fire.  Broadwing argues in response that genuine factual issues remain as to the classification of Broadwing's inventory and the extent of the damage.  Broadwing further argues that even if a particular piece of equipment was not contaminated, the fact that the equipment was exposed to smoke and soot from the fire damaged its value because of the reluctance of a telecommunications carrier to buy potentially contaminated equipment (particularly because, according to Broadwing, the equipment cannot be tested or remediated).  Great Northern has responded by arguing that the insurance policy covers only physical loss, not an economic loss in value.

Under Rule 56(c), summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id* at 249.  Thus, "the judge must ask . . . whether a fair-minded jury

14

could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

The court must view the facts and reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the opposing party must produce evidence upon which a reasonable fact finder could rely. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The mere existence of a "scintilla" of evidence is insufficient to preclude summary judgment. *Anderson*, 477 U.S. at 252.

Under the terms of Broadwing's insurance policy, Great Northern agreed to pay for "direct physical loss or damage to building or personal property caused by or resulting from a peril not otherwise excluded." Broadwing Property Insurance Policy, Policy No. 3576-34-90 BAL. Great Northern argues that the only evidence Broadwing has offered to show that it suffered direct physical loss or damage to its equipment is the testimony of Dr. Emkey and that Dr. Emkey's testimony should be excluded. Even assuming Dr. Emkey's testimony is allowed, Great Northern contends, that testimony will be insufficient to prove Broadwing's equipment was damaged.

As noted above, Dr. Emkey's testimony that there is a possibility that Broadwing's equipment was damaged will be admitted. Dr. Emkey will testify that the size and concentration

15

of the smoke and soot particles released in the fire and the design of Broadwing's equipment, created ideal conditions for particulate contamination and that such contamination could not be tested for or remediated without destroying the equipment. Although Great Northern argues that Dr. Emkey did not examine the equipment and cannot quantify the probability of contamination and has offered its own experts to opine that the equipment can be remediated, drawing all inferences in Broadwing's favor, the Court finds that there remains a genuine issue as to whether Broadwing suffered a loss.  Accordingly, Great Northern's motion for summary judgment of Count I will be denied.

V.   Motions to Seal

Great Northern has moved to seal its: 1) motion for summary judgment of Count I; 2) reply in support of its motion for summary judgment; 3) statement of undisputed facts; 4) its motion to exclude the testimony of Dr. Emkey; 5) reply in support of its motion to exclude Dr. Emkey's testimony; 6) motion to exclude the testimony of Stephen Allen; 7) reply in support of its motion to exclude Mr. Allen's testimony; and 8) the declaration of Rebecca Unruh.  Broadwing has moved to seal: 1) its response in opposition to the motion for summary judgment; 2) its response to Great Northern's statement of undisputed facts; 3) the declaration of Christopher LaFon; 4) its response in opposition

to the motion to exclude Dr. Emkey; 5) the affidavit of Dr. Emkey; 6) the affidavit of Peter Morgan; 7) its response in opposition to the motion to exclude Mr. Allen's testimony; and 8) the pretrial order.  As the motions are unopposed, they will be granted.

VI.  Conclusion

    For the reasons stated above, Great Northern's motions to exclude the testimony of Dr. William Emkey and Stephen Allen and for summary judgment of Count I will be denied.  Great Northern's motions to seal will be granted.

<u>August 16, 2006</u>                           <u>        /s/            </u>
Date                                     William D. Quarles, Jr.
                                         United States District Judge